Case 1:19-cv-00173 Document 42 Filed on 04/25/22 in TXSD Page 1 of 11

United States District Court
Southern District of Texas
**ENTERED**
April 25, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| VALERIA VILLAFRANCA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:19-CV-173 |
| | § | |
| ANTONY J. BLINKEN, | § | |
| | § | |
| Defendant. | § | |

## ORDER AND OPINION

Plaintiff Valeria Villafranca filed this action seeking a declaratory judgment that she is a United States citizen. The matter arose after the Department of State denied Plaintiff's passport renewal application, based on a finding that she did not provide sufficient evidence to establish that she was born in the United States. If true, that fact would preclude Plaintiff from being a United States citizen.

In March 2022, the Court held a bench trial. Based on the record and the applicable law, the Court concludes that Plaintiff has demonstrated by a preponderance of the evidence that she satisfies the statutory requirements to have acquired United States citizenship at birth.

## I. Findings of Fact

At trial, the Court heard testimony from Valeria Villafranca (Plaintiff), Esperanza Fraga de Villafranca (Plaintiff's mother), Martin Villafranca Garcia (Plaintiff's father), Ligia Fraga Lara (Plaintiff's maternal aunt), Leticia Fraga de Robles (Plaintiff's maternal aunt), David Fraga Lara (Plaintiff's maternal uncle), Homero Villafranca (Plaintiff's paternal uncle), and Lucia Guadalupe Lopez de Villafranca (Plaintiff's paternal aunt). Based on their testimony, the admitted exhibits, and the parties' stipulated facts, the Court reaches the following findings of fact regarding Plaintiff's birth.

Martin Villafranca Garcia grew up in Matamoros, Tamaulipas, Mexico, where many of his family members continued to reside at the time of Plaintiff's birth. (Trans., 100:18)[1] In 1975, he married Esperanza Fraga de Villafranca, also a Mexican citizen. (*Id.* at 42:5, 89:8, 99:18) After their marriage, they resided in Madero, Tamaulipas, Mexico, where Mr. Villafranca worked on a ranch and ran a business as a meat distributer in the neighboring town of Tampico. (*Id.* at 101:2-12) Madero, Mexico lies about 300 miles south of Brownsville, Texas.

Although they resided in Madero, the couple arranged for all three of their children to be born in Brownsville with the assistance of three different midwives. (*Id.* at 137:20-138:8) Mr. Villafranca testified that for him, "the natural thing to do was for [his children] to be born in Brownsville" because he had been raised on the border. (*Id.* at 100:19-21) At all relevant times, both Mr. Villafranca and Mrs. Fraga possessed valid border crossing cards, facilitating their entry into the United States. (JPO, Doc. 36, 3–4)

When Mrs. Fraga became pregnant with their second child, her mother-in-law contacted Enriqueta Gonzalez, a licensed midwife in Brownsville, as the women were unable to locate the midwife who had assisted with the birth of Mrs. Fraga's first child. (Trans., 134:15-18) During the pregnancy, Mrs. Fraga visited the midwife in Brownsville about five times for routine checkups. (*Id.* at 102:20) For these visits, she would stay at her mother-in-law's home in Matamoros. (*Id.*) She stated that the midwife's house was located close to several warehouses, and that she "didn't feel safe" in that area. (*Id.* at 54:11–22)

In 1980, the drive from Madero to Matamoros took about seven hours. (*Id.* at 101:22-25) Mr. Villafranca would drive Mrs. Fraga to Matamoros, but due to his busy work schedule at the time, he would return to Madero soon after. (*Id.* at 102:15) He would typically drive back to Matamoros the following weekend to take Mrs. Fraga home, or, Mrs. Fraga would return home by bus. (*Id.* at 44:18) Homero Villafranca, Mr. Villafranca's brother and business partner,

---

[1] The bench trial proceedings have not been officially transcribed. For convenience, the Court includes citations to the draft transcript, which is consistent with the Court's recollection of the testimony.

2

testified that Mr. Villafranca would leave him in charge of the business during these trips to Matamoros, which is how he knew that the couple planned for the baby to be born in Brownsville. (*Id.* at 169:2–21)

As her due date approached, Mrs. Fraga returned to Matamoros in early July with their oldest child, Denise, who was around three years old at the time. (*Id.* at 48:4) Mrs. Fraga's mother and sister, Ligia Fraga Lara, joined her in Matamoros about two weeks before the due date to help take care of Denise. (*Id.* at 149:6) Mr. Villafranca arrived in Matamoros the weekend before the due date. (*Id.* at 105:3–13)

On Wednesday, July 30, 1980, Mrs. Fraga went into labor. (*Id.* at 105:23) She, her husband, and her mother-in-law departed for Brownsville late that morning while her sister and mother stayed in Matamoros with Denise. (*Id.* at 49:11–17) Taking about three hours to cross the border, they arrived around mid-afternoon at the midwife's home in Brownsville. (*Id.* at 106:2–13) Mr. Villafranca waited outside in the car while his mother and Mrs. Fraga were inside with the midwife. (*Id.* at 107:18) Mrs. Fraga gave birth to Plaintiff around 5:30 p.m. (*Id.* at 107:21)

That evening, they all returned to Matamoros, where Mrs. Fraga's mother and Ligia were waiting to celebrate the birth. (*Id.* at 55:1–8) Upon their arrival, Mr. Villafranca and Mrs. Fraga's mother called several of their family members in Madero and Tampico to tell them the news. (*Id.* at 57:12–17, 169:9–20)

Two or three days later, Mrs. Fraga, her mother, Ligia, and Mr. Villafranca, returned to Madero with the newborn. (*Id.* at 55:12–56:6) Plaintiff's aunts and uncles recalled meeting Plaintiff at the family's home in Madero a few days after the birth. (*Id.* at 170:4–5, 162:5–10, 177:24–178:2) These family members were aware that Plaintiff had been born in Brownsville based on the phone calls received from Matamoros, their knowledge that Mr. Villafranca and Mrs. Fraga had been in Matamoros, and information from other family members about the arrangements for the birth. (*Id.* at 109:22, 161:1–4, 176:11–178:2, 181:20–182:5)

On August 6, the midwife registered Plaintiff's birth with the Texas Department of State Health Services, reporting her birth as having taken place on July 30 in Brownsville, Texas. (Tex. Birth. Cert., PX 1, Doc. 40, 1)  Plaintiff's parents did not actually receive the Texas birth certificate until about four months later. (Trans., 68:12)[2]

On August 15, the couple registered Plaintiff's birth in Madero, Mexico, recording that she had been born in that city. (Trans., 113:21; Mex. Birth Cert., DX 4, Doc. 41, 18)  The Madero civil registry office required them to sign a blank form, and when they received the completed birth certificate, they immediately realized that "[t]he date of birth [was] not correct", as the birth date indicated May 24, 1980, rather than July 30. (Trans., 66:6)[3]  Their attempts to obtain an amended copy of the birth certificate proved unsuccessful. (*Id.* at 66:20)

Mrs. Fraga and Mr. Villafranca explained that they fraudulently obtained the Mexican birth certificate because "[b]ack then, there was no dual citizenship", and they wanted Plaintiff to be eligible for "insurance for major medical expenses" and to register for school as a Mexican citizen. (*Id.* at 112:4–113:15, 61:4–5)  Mrs. Fraga testified that she had to use the Mexican birth certificate to register Plaintiff at a private school in Madero, even though the school was aware that she was a United States citizen and there was no reason she could not have attended the school as a foreign student. (*Id.* at 70:18–22)  Plaintiff testified that she became aware that she had a Mexican birth certificate during elementary school because the school told her that her birthday was on May 24, and she asked her mother about it as she had always celebrated her birthday on July 30. (*Id.* at 7:16–25)

In November 1980, Mrs. Fraga and Mr. Villafranca baptized Plaintiff in Madero. (Baptismal Rec., PX 12, Doc. 40-2, 8)  At the time, they had not yet received the Texas birth certificate.  As a result, they used the Mexican birth certificate, and Plaintiff's baptismal record indicated the incorrect May 24 birth date. (Trans., 88:1-24; Baptismal Rec., PX 12, Doc. 40-2, 8)

---

[2] Years later, Mrs. Fraga amended the birth certificate to correct a typographical error in her name. (Amended Tex. Birth Cert., PX 2, Doc. 40, 2)
[3] The parties do not dispute that Plaintiff's birth occurred on July 30, rather than May 24.

4

Mrs. Fraga always told Plaintiff and her other children that they were United States citizens when they were young.  As an adult, however, Plaintiff at times relied on her Mexican birth certificate and represented to the Mexican government that she was born in Madero.  In 2002, when she was in her early twenties, Plaintiff applied for a Border Crossing Card and a Mexican passport as a Mexican citizen.  (Mexican Passport, DX 8, Doc. 41; Border Crossing Card, DX 9, Doc. 41)  Both of these documents state that Plaintiff was born in Tamaulipas, Mexico, on May 24, 1980.  (Mexican Passport, DX 8, Doc. 41, 25; Border Crossing Card, DX 9, Doc. 41, 26)  By this time, she would have been eligible to obtain dual citizenship through the Mexican citizenship of her parents.  (Trans., 40:9–10)

Plaintiff explained that she applied for a Mexican passport in 2002 because she wanted to participate in an international study program in the Netherlands during college.  (*Id.* at 13:1–10)  She had only six weeks to obtain travel documentation for the program before the deadline, and when she called the United States embassy, she was told that it was possible that a passport would not arrive in time.  (*Id.* at 13:10–18)  Consequently, she decided "to apply for a Mexican passport and in that case you just go, walk into an office and you get it right away."  (*Id.* at 18–20)

In 2006, Plaintiff applied for a United States passport, this time relying on her Texas birth certificate.  (United States Passport, PX 13, Doc. 40-2, 10–14)  She received a request for additional evidence a month later, and was not issued a United States passport until 2010, after she participated in an interview at the United States embassy in Mexico City.  (United States Passport, PX 13, Doc. 40-2, 10–14; Trans., 17:11–18:3)

In 2011, Plaintiff initiated a civil court case in Mexico "to correct everything from [her] Mexican birth certificate" before having her own children. (Trans., 22:14–19)  She was successful in that lawsuit.  (*Id.* at 154:22)

In 2019, when Plaintiff reentered the United States through an airport in McAllen, Texas, the United States retained her passport.  (*Id.* at 25:10–19)

5

In 1996, the midwife who attended Plaintiff's birth was convicted for filing false birth certificates, although the case did not concern Plaintiff's birth birth record. (*See* Enriqueta Gonzalez-Navaro's Court Records, DX 3, Doc. 41, 3–17) Mrs. Fraga and Mr. Villafranca testified that when Plaintiff was born, they had no knowledge of any criminal activity on the part of the midwife, and did not learn of her conviction until around 2012. (Trans., 138:6–8, 82:14–25) The two midwives who recorded the births of Plaintiffs' two siblings also were later convicted of filing false birth certificates, although again, those prosecutions did not involve the Villafranca family. (*Id.* at 82:14–25, 138:6–8)

## II. Conclusions of Law

### A. Applicable Standards

Plaintiff brings this declaratory judgment action under 8 U.S.C. § 1503(a), which provides a mechanism for an individual within the United States to challenge the denial of a right or privilege based on the determination of her citizenship. Under Section 1503(a), "[t]he Court must make a *de novo* determination of whether a plaintiff is a United States citizen." *Garcia v. Clinton*, 915 F. Supp. 2d 831, 833 (S.D. Tex. 2012), *aff'd sub nom. Garcia v. Kerry*, 557 F. App'x 304 (5th Cir. 2014).

"There are two sources of citizenship, and two only: birth and naturalization." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006) (quoting *Miller v. Albright*, 523 U.S. 420, 423 (1998)). In the current matter, Plaintiff claims she acquired citizenship at the time of her birth by virtue of being born in the United States.

In a Section 1503(a) case, the district court holds a bench trial and weighs the evidence, determines the credibility of witnesses, and resolves conflicting testimony. FED. R. CIV. P. 52(a)(1), (6); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984). A plaintiff must prove, "by a preponderance of the evidence, that he is an American citizen by birth." *Garcia*, 557 F. App'x at 308 (citing *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958)); *see also* 22 C.F.R. § 51.40 ("The applicant has the burden of proving that he or she is a U.S. citizen . . . ."). Proving a fact by

6

a preponderance of the evidence means showing that the existence of that fact "is more likely than not." *Matter of Briscoe Enterprises, Ltd. II*, 994 F.2d 1160, 1164 (5th Cir. 1993). In essence, if the evidence demonstrates only that it is equally likely that the plaintiff was born in a foreign country as in the United States, the plaintiff has not carried her burden.

Section 1503(a) lawsuits typically involve specific types of documentary evidence for which certain legal principles apply. For example, a "contemporaneously filed foreign birth record creates a presumption of alienage and is almost conclusive evidence of birth in that country." *Sanchez v. Kerry*, No. 4:11-CV-02084, 2014 WL 2932275, at *4 (S.D. Tex. June 27, 2014), *aff'd*, 648 F. App'x 386 (5th Cir. 2015). Courts weigh whether a filing is "contemporaneous" on a sliding scale, and have found that filing within three, eight, and eleven days after birth satisfied the standard. *See Candela-Rios v. Lynch*, No. SA-16-MC-00220-JWP, 2017 WL 11046200, at *14 (W.D. Tex. Jan. 9, 2017), *aff'd sub nom. Candela-Rios v. Sessions*, 737 F. App'x 187 (5th Cir. 2018) (three days after birth); *Cobos v. Kerry*, No. CIV.A. H-13-02897, 2015 WL 3965660, at *7 (S.D. Tex. June 30, 2015) (eight days after birth); *Beltran v. Rivera*, No. 2:10-CV-24288-KMM, 2012 WL 2675477, at *3 (S.D. Fla. July 6, 2012) (eleven days after birth). A foreign birth certificate that contains accurate corroborating details, such as names and addresses, holds greater credibility. *See Sanchez*, 2014 WL 2932275, at *1.

In similar fashion, a Texas birth certificate "registered under this title that is certified by the state registrar is prima facie evidence of the facts stated in the record." TEX. HEALTH & SAFETY CODE ANN. § 191.052. But this evidence is rebuttable, "because prima facie evidence only refers to a minimum quantity, and constitutes enough evidence that raises either a presumption of fact, or that, which is sufficient, when unrebutted, to establish the fact." *See Sanchez*, 2014 WL 2932275, at *4 (quoting *Pinto-Vidal v. Att'y Gen. of U.S.*, 680 F. Supp. 861, 862 (S.D. Tex. 1987)). The Full Faith and Credit Clause of Article IV, Section 1 of the United States Constitution does not require federal courts to give preclusive effect to a determination by the Texas Department of Health and Human Services that a person was born in Texas. *See Sanchez v. Clinton*, No. CIV.A.

7

H-11-2084, 2012 WL 208565 (S.D. Tex. Jan. 24, 2012), *aff'd sub nom. Sanchez v. Kerry*, 648 F. App'x 386 (5th Cir. 2015).

Where the plaintiff's birth is registered in both the United States and a foreign country, "[c]ourts have found that a delayed birth certificate is either entitled to far less evidentiary weight than a contemporaneously filed birth certificate, or given no evidentiary weight." *Sanchez*, 2014 WL 2932275, at *4 (cleaned up). Where both birth certificates were created contemporaneously, the latter record may still be afforded less weight. *See Candela-Rios*, 2017 WL 11046200, at *13 ("Although petitioner submitted evidence of a Texas birth certificate, it post-dated his Mexican birth certificate, was not signed by either parent, and was recorded twelve days after petitioner's reported birth in Texas; it is, therefore, afforded less weight than petitioner's Mexican birth record."). A court affords "little weight" to evidence that a plaintiff has modified or canceled a foreign birth certificate because the Mexican judge must accept all the plaintiff's allegation as true. *Garcia*, 915 F. Supp. 2d at 834.

Baptismal certificates, medical records, and school records constitute evidence of an individual's birthplace, but courts consider such documents as "secondary evidence". *See, e.g., De La Cruz v. Clinton*, No. A-11-CV-675-AWA, 2012 WL 1941373, at *2 (W.D. Tex. May 29, 2012).

As for testimony, courts weigh the credibility of witnesses, but receive a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas*, 251 F.2d at 872; *see also Garcia*, 915 F. Supp. 2d at 835; *Patel v. Rice*, 403 F. Supp. 2d 560, 565 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. 2007). Interested witnesses is a term of art that is not *per se* limited to the plaintiff and family members; long-time family friends may also represent interested witnesses. *See Patel*, 403 F. Supp. 2d at 565.

8

### B. Application

Applying the relevant standard and legal principles to the evidence admitted at trial, the Court concludes that Valeria Villafranca has established by a preponderance of the evidence that she was born in the United States.

The testimony by Plaintiff's mother, father, three aunts, and two uncles consistently confirmed that she was born on July 30, 1980, in Brownsville, Texas. While these family members represent interested witnesses to varying degrees, they developed a consistent and reinforced timeline. For example, Mr. Villafranca and Mrs. Fraga shared of their multiple trips to Matamoros for pre-natal visits with the midwife in Brownsville. Mr. Villafranca's brother recalled having to assume responsibility for the family business in Madero during those trips.

Plaintiff's father and mother also testified in detail about traveling to Brownsville on the day of Plaintiff's birth, and then returning to Matamoros that evening. Her maternal aunt, Ligia, testified about spending time with the family in Matamoros before Mrs. Fraga went into labor and left for Brownsville, and then seeing the newborn Plaintiff on the evening of her birth. The aunts and uncles who lived in Madero at the time recalled receiving phone calls from Matamoros informing them of the birth, and then seeing Plaintiff as a newborn a few days later. The Court found these witnesses credible, and the testimony they provided proved consistent through cross examination.

The witnesses also provided rational explanations for the documentary evidence that contradicts Plaintiff's version of the facts. Her parents explained why they chose to fraudulently register her birth in Mexico, and why they felt compelled to use that document for purposes of Plaintiff's baptism. In addition, Plaintiff's testimony satisfactorily explained why she utilized the fraudulent Mexican birth certificate in her early twenties to obtain a Mexican passport.

The Government reasonably emphasizes that Plaintiff and her parents concede that as to the Plaintiff's birth place, they have made representations to government authorities in the United States that directly contradict their representations to Mexico authorities. In essence, Plaintiff

and her parents acknowledge being untruthful to government officials.  This fact, however, does not automatically render all of their representations false.  It is equally likely that her parents misrepresented Plaintiff's birthplace as Madero to the Mexican government, as it is that they misrepresented her birthplace as Brownsville before the Texas state agency.  At trial, the United States had the opportunity to cross examine these individuals, as well as Plaintiff's aunts and uncles.  While the Court disapproves of the Plaintiff's and her parents' misrepresentations to government authorities, the Court finds, based on a preponderance of the evidence, that it is more likely than not that Plaintiff was born in Brownsville, and that the misrepresentations about her birth were to Mexican officials.

In addition to questioning the witnesses' credibility, the Government places great weight on Plaintiff's Mexican birth certificate, which Mrs. Fraga and Mr. Villafranca recorded in Madero about two weeks after the birth.  Although this document represents a contemporaneous birth record, so does Plaintiff's Texas birth certificate, recorded even earlier, at one week after the birth.  Given that both documents constitute contemporaneous birth records, neither is entitled to greater weight.  If any document warranted greater weight, it would be the Texas birth certificate, as it was registered a week earlier, and the Mexican birth certificate contains a date of birth that both parties agree is incorrect, slightly weakening the credibility of that document.  In the end, however, the Court weighs these documents equally.

The Government also challenges the reliance on the Texas birth certificate because the midwife who registered it was convicted in the 1980's of birth certificate fraud.  And the midwives who attended the births of Plaintiff's two siblings engaged in the same criminal conduct.  The Court acknowledges the implications of this pattern.  But those criminal cases did not involve the Plaintiff's birth certificate or her sisters' birth records, and the Government presented no evidence that these midwives committed fraud with respect to every, or even the majority, of the birth certificates they registered.  Although the fraudulent conduct raises general suspicions about the

birth certificates these midwives registered, such suspicions do not contradict or undermine the credible testimony of the witnesses in this case.

In the end, although some evidence supports the Government's position, the record as a whole demonstrates that Mrs. Fraga gave birth to Plaintiff in Brownsville, Texas, on July 30, 1980. As a result, the Court finds that Valeria Villafranca has proven by a preponderance of the evidence that she was born in the United States.

### III.   Conclusion

Based on the Court's findings of fact and the applicable law, it is:

**ORDERED** that Plaintiff Valeria Villafranca's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **GRANTED**.

The Court will separately issue a Final Declaratory Judgment in accordance with this Order and Opinion.

Signed on April 25, 2022.

_____
Fernando Rodriguez, Jr.
United States District Judge